## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER VAN LEEUWEN, | Civil Action No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| SCOTT WAGNER, individually and in his individual capacity as State Senator for Senate District 28 in the Commonwealth of Pennsylvania, | |
| Defendant. | |

## COMPLAINT

Plaintiff Christopher Van Leeuwen, by and through his attorneys, Stember Cohn & Davidson-Welling, LLC, brings this Complaint against Defendant Scott Wagner and alleges as follows:

### I. PRELIMINARY STATEMENT

1. This case concerns fundamental rights guaranteed by the First and Fourth Amendments to the U.S. Constitution, made applicable to the states by the Fourteenth Amendment.

2. By protecting the freedom of the press, the First Amendment "assures the maintenance of our political system and an open society," securing "the paramount public interest in a free flow of information to the people concerning public officials." *Pell v. Procunier*, 417 U.S. 817, 832 (1974).

3. Indeed, it "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l. Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978). For this

reason, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

4.      The Fourth Amendment, which prohibits unreasonable searches and seizures, prohibits government officials' "interference with an individual's possessory interests in [his or her] property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992). Searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment." *Horton v. California*, 496 U.S. 128, 134 (1990).

5.      On May 2, 2017, Defendant Scott Wagner, then a Pennsylvania State Senator, displayed a profound lack of respect for these constitutional rights.

6.      While giving a speech to his constituents, Senator Wagner learned that his speech was being recorded. The recording itself did not bother Senator Wagner. Rather, it was the fact that this recording was being done by Christopher Van Leeuwen, a "liberal tracker" working for American Bridge 21st Century ("American Bridge"), which Senator Wagner viewed as an "opposition group" funded by his political opponents.

7.      Upon discovering Van Leeuwen's affiliation with American Bridge, Senator Wagner charged Van Leeuwen, physically prevented Van Leeuwen from continuing his recording, seized Van Leeuwen's recording equipment and personal property, and physically assaulted Van Leeuwen as punishment.

8.      Since his outburst was publicly revealed, Senator Wagner has disparaged, lied about, harassed and bullied Van Leeuwen.

9.      The First and Fourth Amendments apply equally to all citizens, regardless of their position or political affiliation. While Senator Wagner may disagree with Van Leeuwen's work, or the political perspective of his employer, he may not use his position to suppress First

2

Amendment-protected activities, or seize others' personal property without establishing probable cause. Yet that is precisely what Senator Wagner did, and why he must be held accountable for his misconduct.

## II.  THE PARTIES

10.     Plaintiff Christopher Van Leeuwen is an adult individual who resides in Philadelphia County, Pennsylvania.

11.     Defendant Scott Wagner ("Defendant" or "Senator Wagner") is the former State Senator for Senate District 28 of the Commonwealth of Pennsylvania, and resides in Spring Garden Township, Pennsylvania.

## III.  JURISDICTION AND VENUE

12.     This action seeks injunctive relief and damages under 42 U.S.C. § 1983, based on Defendant's violations of Plaintiff's rights under the First and Fourth Amendments to the United States Constitution. Accordingly, this Court has subject matter jurisdiction over his constitutional claims pursuant to 28 U.S.S. §§ 1331 and 1343. This Court has supplemental jurisdiction over his state law claims under 28 U.S.C. § 1367.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1392, as the acts and omissions that give rise to these claims occurred in this District.

14.     Defendant's constitutional violations are actionable pursuant to 42 U.S.C. § 1983.

## IV.  FACTS

15.     From 2014 until late 2018, Van Leeuwen worked for American Bridge, "a progressive research and communications organization committed to holding Republicans

3

accountable for their words and actions and helping [the public] ascertain when Republican candidates are pretending to be something they're not."

16.     American Bridge employed Van Leeuwen as a "tracker." In that role, Van Leeuwen was tasked with attending and recording the political speeches of Pennsylvania Republican politicians, including Senator Wagner.

17.     On May 2, 2017, Senator Wagner was scheduled to appear and give a speech to his constituents at an event hosted by the Country Club of York ("the Club").

18.     The May 2, 2017 event ("the Event"), which was organized by York County Estate Planning Council, was not an exclusive or limited event, in that no invitations or tickets were required to attend, nor was attendance limited to members of the Club.

19.     Prior to the Event, Van Leeuwen had attended numerous speaking events featuring Senator Wagner, where he recorded the audio and video of such speeches without incident.

20.     The Event was scheduled to occur from 11:45 a.m. to 1:30 p.m., and Van Leeuwen arrived at the Club shortly before 11:45 a.m.

21.     Upon his arrival, Van Leeuwen entered the Club, carrying his recording equipment, which included: a Olympus digital voice recorder (VN702PC); a Canon video camera with a dual-recording mode (VIXIA HFR40); an Audio-Technica "shotgun mic" (used for directional recording); a Sandisk 32GB SIM card; a tripod; a VLU Life One X2 mobile phone (with video recording capabilities); and ancillary equipment (including power cords, and backup batteries).

22.     Upon his entrance, Van Leeuwen had his camera rolling.

23.     After entering the Club, Van Leeuwen saw the Club's attendant or receptionist, who was stationed at a window to the right of the Club's entrance. Carrying all of his recording

4

equipment, Van Leeuwen stated that he was for Senator Wagner's speech, and asked to be directed to the room in which the Event was scheduled to take place.

24.   The Club's attendant directed Van Leeuwen to the ballroom where the Event was set to occur.  She did not ask Van Leeuwen for a ticket or to see any identification, nor did she give Van Leeuwen any indication that he was not welcome on the Club's property.

25.   Van Leeuwen proceeded toward the ballroom where the Event was to occur. Just 10 seconds later, he saw Senator Wagner, who was coming down the stairs. Senator Wagner exchanged greetings with Van Leeuwen, who was still openly filming at that time. Senator Wagner appeared to recognize Van Leeuwen from past events.

26.   At that time, Senator Wagner stated no objection to Van Leeuwen's presence at the Club, or in the room of the Event.

27.   Van Leeuwen entered the ballroom and proceeded to set up his recording equipment, including his tripod, camera, and audio recording equipment.

28.   As Van Leeuwen was setting up his equipment, a woman organizing the Event approached him and asked why he was at the Event.  Van Leeuwen responded that he was "here to record the Senator."  She said, "Does he know that you're here?" Van Leeuwen replied, "He said hi to me on the way in." She then said, "Okay, I assume you just follow him around and film him?" to which Van Leeuwen replied, "Yeah."

29.   A short while later, Senator Wagner was introduced, at which point he began his speech.

30.   Van Leeuwen placed his recording equipment directly in front of Senator Wagner, and filmed Senator Wagner's speech.

31. Approximately 60 minutes into his speech, Senator Wagner pointed at Van Leeuwen and said to the audience, "Is this guy one of your guys or is he a tracker?"

32. He then asked Van Leeuwen, "Who are you with?" Van Leeuwen replied, "I'm with American Bridge."

33. Senator Wagner then told Van Leeuwen, "I'm going to confiscate your camera."

34. Senator Wagner turned to the audience and said, "You're about to see your Senator in action."

35. Senator Wagner then charged toward Van Leeuwen, told him, "I'm taking your camera," and began to disassemble and confiscate Van Leeuwen's recording equipment.

36. Van Leeuwen responded to Senator Wagner, saying, "You can't take my camera."

37. Senator Wagner replied, "I'm taking it. Watch me take it."

38. After his camera was confiscated by Senator Wagner, Van Leeuwen began to record the incident with his mobile phone's camera. As Senator Wagner was taking his personal property, Van Leeuwen wanted to make sure he recorded the incident.

39. Van Leeuwen then repeatedly asked Senator Wagner to return his property. Specifically, Van Leeuwen said, "May I please have my camera back, that's my property."

40. Instead of returning his property, Senator Wagner lunged at Van Leeuwen, shoved Van Leeuwen's camera into his face, violently grabbed Van Leeuwen's hand, and then tried to pry away Van Leeuwen's cell phone.

41. While "confiscating" Van Leeuwen's camera, Senator Wagner aggressively pulled Van Leeuwen's equipment, causing a tear in Van Leeuwen's finger.

42. Van Leeuwen told Senator Wagner, "You just assaulted me," and showed him that his finger was bleeding as a result of Senator Wagner's attack.

6

43.    Senator Wagner walked away, taking Van Leeuwen's equipment with him. Van Leeuwen then followed Senator Wagner, who still had possession of Van Leeuwen's equipment.

44.    Because of Senator Wagner's violent conduct and confiscation of his equipment, Van Leeuwen continued to film Senator Wagner, hoping to retrieve his equipment and deter further violent action.

45.    Senator Wagner then left that area of the Club, carrying Van Leeuwen's video camera and its SIM card. Another unknown person helped Senator Wagner carry Van Leeuwen's tripod, his shotgun microphone, and the bracket that holds them together.

46.    Van Leeuwen then spoke with a manager of the Club, explaining that Senator Wagner had just confiscated his private property, and taken it to a private location in the Club.

47.    Throughout this period, neither the Club manager nor any other representative of the Club asked Van Leeuwen to leave.

48.    During this same period, Senator Wagner threatened to call the police. Van Leeuwen encouraged him to do so, because Senator Wagner had assaulted him and was refusing to return Van Leeuwen's property.

49.    Approximately 30 minutes later, the Spring Garden police officers ("the local police") arrived.

50.    The local police first spoke with Van Leeuwen, who explained that he was bleeding because Senator Wagner had attacked him, and that Senator Wagner had confiscated Van Leeuwen's personal property (including the camera, battery, tripod, and memory card that Van Leeuwen had used to record Senator Wagner).

51.    The local police met with Senator Wagner privately, then returned to Van Leeuwen carrying some of his property (including his camera, his camera battery, and his tripod). On

7

information and belief, Van Leeuwen alleges that the local police retrieved this equipment directly from Senator Wagner.

52.     However, the local police did not retrieve or return the video memory card, which contained some of the master footage that Van Leeuwen had recorded that day. Much of the video footage recorded that day is not recoverable without the memory card.

53.     Despite repeated requests, Senator Wagner never returned the video memory card that he had confiscated.

54.     A significant portion of the confrontation described above was captured on video. As a result, when American Bridge released that footage publicly, it generated significant media attention and controversy regarding Senator Wagner's actions.

55.     In response to the controversy, Senator Wagner made false and defamatory statements about Van Leeuwen.

56.     Specifically, on his own campaign website, Senator Wagner falsely stated that Van Leeuwen had "gained entry to the event under false pretenses." (*See* https://wagnerforgov.com/2017/05/04/democratic-dirty-tricks/ (last accessed January 7, 2019).)

57.     On the same page, Senator Wagner falsely accused Van Leeuwen of "record[ing] the conversations at this private meeting without the consent of those in attendance." *Id.*

58.     Further, Senator Wagner falsely stated that Van Leeuwen had "trespass[ed] on private property, gain[ed] entry under false pretenses, intimidate[d] my constituents and supporters and record[ed] them without their consent." *Id.*

59.     In another statement, Senator Wagner stated that Van Leeuwen "lied and trespassed on private property for a speech that I was giving in my role as a senator." (*See*

8

https://triblive.com/local/westmoreland/12265416-74/sen-wagner-dodges-questions-about-video-confrontation (last accessed on January 4, 2019).)

60.    Further, Senator Wagner falsely stated that "instead of leaving when he was asked, [Van Leeuwen] continued to harass me and the people at the event."

61.    Since that time, Van Leeuwen continued in his role as a tracker and was assigned to cover Senator Wagner's speaking engagements during his ultimately unsuccessful gubernatorial campaign.

62.    At more than a dozen rallies filled with his supporters, Senator Wagner identified Van Leeuwen by name, and pointed him out to the crowd as the "liberal tracker" who "works for Soros."

63.    At one event, Senator Wagner said that, despite his personal wealth, he would take a salary if elected, in order to "fight lawsuits from people like Christopher [Van Leeuwen]."

64.    In response, members of Senator Wagner's audience shouted at, approached, and intimidated Van Leeuwen, causing him to fear for his safety.

65.    On or around August 27, 2018, Van Leeuwen approached Senator Wagner's campaign manager (Jason High), to request that Senator Wagner stop identifying Van Leeuwen at events, because it was causing him to fear for his safety.

66.    At a speaking event later that same day, Senator Wagner identified Van Leeuwen to his audience yet again, claiming that he is "funded by Soros" in a further effort to rally his audience against Van Leeuwen.

67.    As a direct and proximate result of Defendant's actions, Plaintiff has sustained damages, including damaged or diminished reputation within the community; emotional distress and mental anguish; loss of personal property; and attorney's fees.

## COUNT I
### (42 U.S.C. §1983 — First Amendment)

68.     The foregoing paragraphs are incorporated by reference.

69.     Under the First Amendment to the United States Constitution, Plaintiff had the right to engage in free speech on matters of public importance, which right includes the creation of video and audio recordings.

70.     As described above, Plaintiff exercised his First Amendment rights by, *inter alia*, attending and recording political speeches made by Defendant Scott Wagner.

71.     As a Pennsylvania state actor, Defendant at all times has been prohibited from restraining or suppressing Plaintiff's exercise his First Amendment rights and from retaliating against Plaintiff on the basis of such exercise.

72.     As outlined above, Defendant violated Plaintiff's exercise of First Amendment rights and retaliated against Plaintiff for his exercise of his First Amendment rights, by, *inter alia*, threatening Plaintiff, assaulting Plaintiff, verbally and physically attacking Plaintiff, physically preventing Plaintiff from recording Defendant's political speech, stealing Plaintiff's personal property, making false and defamatory statements about Plaintiff to the media, and by encouraging Defendant's supporters to harass and intimidate Plaintiff.

73.     Defendant's actions were motivated, in whole or in part, by Plaintiff's First Amendment-protected activities.

74.     Defendant had no legitimate governmental interest or other justification supporting his violation of Plaintiff's First Amendment Rights.

75.     As a direct result of Defendant's actions, Plaintiff has sustained damages, including damaged or diminished reputation within the community; emotional distress and mental anguish; loss of personal property; and legal costs and attorney's fees.

## COUNT II
### (42 U.S.C. §1983 — Fourth Amendment)

76.     Plaintiff incorporates all allegations in the preceding paragraphs.

77.     As described above, Defendant confiscated and repeatedly refused to return Plaintiff's property.

78.     In this regard, Defendant's actions constitute a "seizure" within the meaning of the Fourth Amendment to the United States Constitution.

79.     Defendant effected a seizure of Plaintiff's personal property without a warrant or any other legitimate justification for such a seizure.

80.     Defendant had no authority to seize Plaintiff's property.

81.     Accordingly, Defendant violated Plaintiff's Fourth Amendment rights to be free from unreasonable seizure of his property.

82.     On information and belief, Defendant's actions were undertaken with the specific intent to deprive Plaintiffs of his constitutional right to be secure in his property.

83.     At a minimum, in unlawfully seizing Plaintiff's property, Defendant acted with deliberately indifference to Plaintiff's constitutional right to be secure in his property.

## COUNT III
### (Conversion)

84.     Plaintiff incorporates by reference all allegations in the preceding paragraphs.

85.     As described above, Defendant intentionally deprived Plaintiff of his possessions and use of his personal property, without Plaintiff's consent and without lawful justification.

86.     In this regard, Defendant's actions constitute conversion within the meaning of Pennsylvania common law.

11

## COUNT IV
### (Battery)

87.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

88.    As described above, Defendant intentionally engaged in unwanted and offensive physical contact with Plaintiff, without Plaintiff's consent.

89.    In this regard, Defendant's actions constitute battery within the meaning of Pennsylvania common law.

90.    As a direct result of Defendant's actions, Plaintiff has suffered physical injury, pain, humiliation, embarrassment and other emotional distress.

## COUNT V
### (Assault)

91.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

92.    As described above, while engaging in unwanted and offensive physical contact with Plaintiff, without Plaintiff's consent, Defendant intentionally placed Plaintiff in imminent fear of bodily harm.

93.    In this regard, Defendant's actions constitute assault within the meaning of Pennsylvania common law.

94.    As a direct result of Defendant's actions, Plaintiff has suffered mental anguish, humiliation, embarrassment and other emotional distress.

## COUNT VI
### (Intentional Infliction of Emotional Distress)

95.    Plaintiff incorporates by reference all allegations in the preceding paragraphs.

96.    As described above, Defendant's conduct was outrageous.

12

97. In this regard, Defendant's actions constitute intentional infliction of emotional distress within the meaning of Pennsylvania common law.

98. As a result of Defendant's outrageous conduct, Plaintiff has suffered, and continues to suffer, severe emotional distress.

## COUNT VII
### (False Light)

99. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

100. As described above, Defendant made and disseminated public statements about Plaintiff. Specifically, Defendant asserted that Plaintiff had engaged in trespassing on May 2, 2017, and that he refused to leave the Country Club of York when asked.

101. Defendant's statements were false and offensive.

102. Defendant knew that he had no legitimate justification for making such statements.

103. In this regard, Defendant's actions constitute the tort of "false light" within the meaning of Pennsylvania common law.

104. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, emotional distress, embarrassment, and damage to his reputation.

## COUNT VIII
### (Defamation)

105. Plaintiff incorporates by reference all allegations in the preceding paragraphs.

106. As described above, Defendant made and disseminated public statements about Plaintiff. Specifically, Defendant asserted that Plaintiff had engaged in trespassing on May 2, 2017, and that he refused to leave the Country Club of York when asked.

107. Defendant's statements were false and offensive.

13

108. Defendant knew that he had no legitimate justification for making such statements.

109. In this regard, Defendant's actions defamed Plaintiff within the meaning of Pennsylvania law.

110. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, emotional distress, embarrassment, and damage to his reputation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

A. Declare that Defendant violated Plaintiff's constitutional rights under the First and Fourth Amendments to the U.S. Constitution;

B. Declare that Defendant is liable to Plaintiff for the intentional torts of battery, assault, conversion, intentional infliction of emotional distress, defamation and false light;

C. Award Plaintiff compensatory damages, in an amount to be determined at trial, for pain, emotional distress, pain, humiliation, and embarrassment caused by Defendant's wrongful acts;

D. Award Plaintiff monetary damages, in an amount to be determined at trial, for the loss of his personal property;

D. Award Plaintiff monetary damages, in an amount to be determined at trial, for the damage to his reputation caused by Defendant's actions;

E. Award Plaintiff punitive damages based on Defendant's willful tortious conduct, and intentional violation of Plaintiff's constitutional rights;

F. Award Plaintiff attorneys' fees and costs of the action, pursuant to 42 U.S.C. § 1988; and

G. Award such other relief as this Court may deem just and proper.

14

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims or issues so triable.

Respectfully submitted,

Dated: January 7, 2019

/s/Vincent J. Mersich

Vincent J. Mersich, Esquire
PA ID No. 310971
vmersich@stembercohn.com
**STEMBER COHN &
    DAVIDSON- WELLING, LLC**
The Hartley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA  15219
T.: (412) 338-1445
F.:  (412) 338-1446

*Attorneys for Plaintiff*

15